IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MALIK DOUGLAS, et al.,

    Plaintiffs,

      v.

DEKALB COUNTY, GEORGIA, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:06-CV-0584-TWT

## OPINION AND ORDER

This is a civil rights action.  It is before the Court on the Defendants' Motion for Summary Judgment [Doc. 51].   For reasons stated below, the motion is GRANTED.

## I. Background

This case arises out of the DeKalb County Police Department's decision to discipline or terminate three police officers.  According to the officers, they were retaliated against because of their involvement with  the International Brothers of Police Officers.  According to the Defendants, the Plaintiffs were disciplined for insubordination and violation of county policies. Two of the Plaintiffs, Malik Douglas and Jimmy Faust, allege that they were fired in violation of their First Amendment

rights to freedom of speech and association.[1]  The third Plaintiff, Shane Smith, alleges that he was demoted because of his union activities.  Smith, who is white, also contends that black officials in DeKalb County racially discriminated against him. The Defendants are DeKalb County, former Chief of Police Louis Graham, former Assistant Chief Ray Flemister, Commander of Internal Affairs Thomas Lane, Lieutenant Michael Reynolds, and Investigators Janice Love and K.K. Jones.  They seek summary judgment.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond

---

[1]Although Douglas brought defamation and tort claims against DeKalb County CEO Vernon Jones, the Plaintiff does not respond to the Defendant's arguments in the Response.  Thus, the claims are abandoned.  In any event, the Defendant Jones is entitled to summary judgment on the merits.  The alleged defamatory statements were either true or mere statements of opinion.

the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

### III. Discussion

The Plaintiffs, by way of 42 U.S.C. § 1983, allege that the Defendants violated their First Amendment rights of freedom of speech and association.  Section 1983 provides a cause of action for persons whose rights under the federal constitution have been violated under color of state law.  42 U.S.C. § 1983.  The statute confers no substantive rights itself.  Rather, it provides "a method of vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393-94 (1989).  To establish a section 1983 violation, the Plaintiffs must show (1) conduct committed by a person acting under color of state law (2) that deprived them of rights, privileges, or immunities secured by the Constitution or laws of the United States.  Parratt v. Taylor, 451 U.S. 527, 535 (1981).

Although the Plaintiffs' Complaint alleges both freedom of speech as well as freedom of association claims, it appears from their Response to the Defendants' Motion for Summary Judgment, that they are, in reality, only advancing a freedom of association claim.  Their theory of the case is that the Plaintiffs were fired because of their participation in the union.[2]  Oddly, however, they rely upon evidence which,

---

[2]

The Plaintiffs have consistently taken the approach of shoot first and aim

according them, is proof of widespread discrimination against white employees. Both Douglas and Faust are black. Apparently recognizing the logical inconsistency here, the Plaintiffs contend that DeKalb County officials, such as Graham and Flemister, saw the union as advancing a "white agenda." This is typical of the sort of logical gyrations and wild speculation relied upon by the Plaintiffs. They argue that they were retaliated against for their union membership, and not because of any particular speech acts.

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Supreme Court has interpreted these words as also protecting an implicit and corresponding right to associational activity. See e.g. Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984) ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in a wide variety of political, social, economic, religious, and cultural ends."). Indeed,

---

later. In cases such as this there is generally a negative correlation between the ferocity of the rhetoric (and the number of pages of the papers) and the merits of the case. There is a similar negative correlation between the number of Defendants named and the merits of the case as to anyone in particular.

"[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." Id.

Public employees, such as police officers, are also protected by the right to free association. See Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 500 (1952) ("[T]he liberty of speech and of the press which the First Amendment guarantees against abridgement by the federal government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action."); Garcetti v. Ceballos, 126 S.Ct. 1951, 1957 (2006) ("The Court has made clear that public employees do not surrender all of their First Amendment rights by reason of their employment."); D'Angelo v. School Board of Polk County, 497 F.3d 1203, 1212 (11th Cir. 2007).   And the First Amendment protects public employees from retaliation because of their expression of that right.  Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 465 (1979) ("The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so.") (citing Pickering v. Board of Education, 391 U.S. 563, 574-575 (1968)).  But the right is not unqualified. See Garcetti, 126 S.Ct. at 1958 ("When a citizen enters government service, the citizen by necessity

must accept certain limitations on his or her freedom."); Ross v. Clayton County, 173 F,3d 1305, 1311 (11th Cir. 1999) ("Under *Pickering* and its progeny, an employee's First Amendment rights are not absolute in the government employment context.").

The framework for striking the appropriate balance between a public employee's First Amendment rights and the government's interest in efficiency was established in Pickering v. Board of Education, 391 U.S. 563 (1968). First, a plaintiff must prove that he was engaging in associative activity not in the course of his employment, but rather "as a citizen." D'Angelo, 497 F.3d at 1212 (interpreting Garcetti as a modification of the Court's Pickering test). The Defendants do not contest the fact that the Plaintiffs engaged in  union activity "as citizens." And although the Eleventh Circuit has yet to address whether union activity by government employees constitutes associative activity "as citizens," it is reasonable to assume that such activity is protected. See, e.g., Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006) ("Because Fuerst's comments that precipitated the adverse action taken against him were made *in his capacity as a union representative*, rather in the course of his employment as a deputy-sheriff . . . the Supreme Court's recent decision in Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), is inapposite.)

Once a plaintiff has met his burden on this threshold legal issue, a court must determine (1) whether the employee's interest in engaging in associative activity

outweighs the employer's interest in discouraging the activity in order to ensure the efficient operation of government services, and (2) whether the employee's conduct played a substantial part in the decision to demote or discharge the employee. <u>Battle v. Board of Regents</u>, 468 F.3d 755, 760 (11th Cir. 2006).  If the employee can meet this burden, the burden shifts to the employer who must show that it would have made the same decision, even in the absence of the protected conduct.

Based on the evidence presented, there is no need to balance the <u>Pickering</u> factors.  The Defendants have presented compelling evidence showing that the Plaintiffs were not disciplined for being members of a union. Rather, they were punished for violating DeKalb County policies.  <u>See</u> <u>Shahar v. Bowers</u>, 114 F.3d 1097, 1113 (11th Cir. 1997) ("*Pickering* balancing does not apply where the employee's constitutionally protected conduct did not motivate the employer's decision.  In such a case, balancing is not necessary; the employer prevails because the employee has not established the element of causation.") (Tjoflat, J., specially concurring).  <u>See</u> <u>also Mt. Healthy v. Doyle</u>, 429 U.S. 274, 286 (1977) (cautioning courts not to narrowly construe the "substantial part" test as a means of putting employees in a better position than they otherwise would have been but for the protected conduct).  Plaintiffs may not use their union activities to provide a cloak of immunity for insubordination and conduct unbecoming a police officer.

The record is rife with evidence that each of the Plaintiffs violated DeKalb County policy, and would have been terminated, or in the case of Plaintiff Smith, demoted, even in the absence of protected union activity.  See Waters v. Churchill, 511 U.S. 661, 678 (1994) (authorizing courts to defer to facts as the employer reasonably found them to be).  The evidence of misconduct justifies the termination and demotion of each of the Plaintiffs.  See Connick v. Myers, 461 U.S. 138, 151 (1983) (noting that the government's discretion to manage personnel includes the "prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch").

Plaintiff Douglas, the President of the union, orchestrated an effort to impact the revenue stream of DeKalb County by organizing a "ticket slow down," the object of which was to encourage fellow officers to write fewer tickets as means of enhancing the union's negotiating leverage.  As a result of an Internal Affairs investigation, the Defendants reasonably believed that he harassed and intimidated other officers that had no desire to join him in the illegal ticket slow down. Furthermore, Douglas secretly tape recorded the Police Chief in violation of DeKalb County policy.  Lastly, Internal Affairs officers determined that Douglas engaged in conduct unbecoming of an officer following domestic disputes that triggered three 911 calls. Plaintiff Faust joined Douglas in the ticket slow down campaign, and

assisted Douglas in harassing fellow employees that had no desire to participate in the endeavor.  He also admitted to secretly tape recording the Police Chief.  Plaintiff Smith joined Douglas and Faust in the ticket slow down.  He was demoted for intentionally omitting pertinent information in a police report about a 911 incident in order to protect Douglas from reprimand.  He also admitted to an attempt to secretly tape the Police Chief.

Although the parties invite the Court to make sense of conflicting allegations about who did what to whom and when, it is unnecessary to address each of the stated reasons for termination.  The evidence of engaging in a ticket slowdown and secret taping are both enough of a reason for termination.  Wading through the muck of swirling allegations is unnecessary, as the Defendants need only advance one reason as to why they were justified in terminating the Plaintiffs.  See Mt. Healthy, 429 U.S. at 286.  The Supreme Court has made clear that even if the Defendants' animosity towards the union played a "substantial part" in the demotion and firings, such animosity cannot salvage the job of an employee who could have been fired anyway. Id.  Otherwise, employees would place themselves in a better position than they would have been simply because they engaged in constitutionally protected conduct.  It suffices to say that detailed judicial commentary upon the scandalous allegations being thrown back and forth amongst the parties would only further lend legitimacy

to this effort to embroil the federal judiciary in what is really an internal employer and employee dispute.  Garcetti, 126 S.Ct. at 1959 ("Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance.") (citation and quotations omitted).  Based on my assessment of all of the allegations of misconduct, and the Plaintiffs' attempts to explain them away, the Plaintiffs were fired for insubordination and violating county policies, not for engaging in union activity.  See Connick, 461 U.S. at 151-52 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.").  Although the Plaintiffs have filed a 132 page Statement of Material Facts, they have advanced no legitimate defense as to why lower ranking officials, such as the Plaintiffs, have the power to disobey orders about ticket writing and secretly taping superior officers.

Even if I apply the Pickering factors, the Defendants cannot establish a constitutional violation.  The Plaintiffs do not explicitly argue, but rather assume, that the ticket writing slow down is protected union activity.  Their interest in engaging in such conduct does not outweigh the government's interest in operating an efficient and effective police department. Oladeinde v. Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) (placing great weight upon the fact that members of a law enforcement

agency are part of a "quasi-military organization"). Associating with fellow officers in order to discuss the means by which public servants can attempt to negotiate better wages and benefits is laudable.  But the Plaintiffs cannot hide under the banner of "union activity" as a defense for conduct which undermines the county's financial base and disobeys the commands of superiors.  Selectively deciding not to perform certain public duties and encouraging others to do the same is not only beyond the scope of protected "union activity," it is illegal.  See O.C.G.A. 45-19-2 ("No public employee shall promote, exchange, or participate in any strike . . ."); O.C.G.A. 45-19-1(3) (defining "strike" as, among other things, "the stoppage or deliberate slowing down of work").

The Plaintiffs do not deny the fact they engaged in the ticket writing slow down.  Rather, they describe it as a "ticket initiative" designed to "remind" officers about DeKalb County policy. (Pls.' Resp. to Defs.' Statement of Material Facts, ¶¶ 17-20.)  Euphemistic quibbling aside, such activity is more than adequate grounds for termination.  To the extent that the Plaintiffs were challenging what they perceived to be an "unfair" ticket writing quota, their complaints must be voiced in ways that do not involve insubordination.  See Arnett v. Kennedy, 416 U.S. 134, 168 (1974) ("[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.").  Although the Plaintiffs argue that

the Defendants have failed to prove that the slow down was actually harmful, employers are not required to show an actual disruption of public services before terminating an employee. See Shahar, 114 F.3d at 1108.

The same goes for secretly taping one's superiors.  Candor, trust, and confidentiality may be undermined where fellow police officers must fear the prospect of having their statements secretly recorded.  Regulations prohibiting such conduct further the goal of ensuring loyalty within any governmental entity,  especially in police departments.  See Campbell v. Towse, 99 F.3d 820, 829-30 (7th Cir. 1996) ("It surely cannot be doubted that individuals who work in the highest echelons of the command of a police department must be assured of the loyalty of their immediate subordinates, as these subordinates are entrusted with carrying out their orders, at times under the most trying conditions."); Oladeinde, 230 F.3d at 1293 (holding that plaintiff's First Amendment interest did not outweigh police department's interest in "maintaining order, loyalty, morale, and harmony").

Furthermore, the individual Defendants are entitled to qualified immunity.  The Defendants are immune from civil liability unless they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity protects government officials performing

discretionary functions from suits in their individual capacities. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).  The Plaintiffs do not contest the fact that the Defendants were performing discretionary functions.

Two questions are central to the qualified immunity defense.  First, was there a violation of a constitutional right? Hope v. Pelzer, 536 U.S. 730, 736-42 (2002); Saucier v. Katz, 533 U.S. 194, 201 (2001).  Second, was the right clearly established? Saucier, 533 U.S. at 201; Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, there was no constitutional violation.  But even if the Plaintiffs had  established a constitutional violation, the Defendants would still be immune from civil liability. After Hope, courts have been hesitant to hold that the case-by-case First Amendment retaliation analysis applies with obvious clarity to a defendant's conduct.  See Collier v. Clayton County Community Service Bd., 236 F. Supp. 2d 1345, 1369 (N.D. Ga. 2002) ("[I]t is clear that the matter is debatable enough so as to lead to the conclusion that the law was not sufficiently established to alert the defendants that they might have been acting illegally."); see also Anderson v. Burke County, Ga., 239 F.3d 1216, 1222 (11th Cir. 2001) ("[O]nly in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights.") (quoting Hansen v. Soldenwagner, 19 F.3d 573, 576 (11th Cir. 1994)); Lassiter v. Alabama A&M University, Bd. of Trustees, 28 F.3d

1146, 1150 (11th Cir. 1994). Given the evidence of employee misconduct, and the fact that a reasonable official would not have been on notice that the First Amendment constrains an employer's discretion to terminate insubordinate employees, the individual Defendants' are entitled to qualified immunity on the First Amendment claims.

Even if the Plaintiffs had a valid First Amendment claim, the claims against the Defendants DeKalb County and the individual Defendants in their official capacity fail.  First, a suit against a government officer in his official capacity is the same as a suit against the county.  Kentucky v. Graham, 473 U.S. 159, 165 (1985). Thus, the only official capacity claim is against DeKalb County - not the individual defendants. The claims against the individual Defendants in their official capacity should be dismissed.  Second, the county cannot be liable under section 1983 on a theory of respondeat superior.  Monnell v. Department of Social Services, 436 U.S. 658, 690 (1978).  The county may only be held liable for the execution of a governmental policy or custom.  Id. at 694.  But a municipality is not liable for terminating an employee unless the decisionmaker had final authority to set policy over hiring and firing.  Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir. 2003). An official does not have final policymaking authority if her decisions are subject to meaningful administrative review.  Scala v. City of Winter Park, 116 F.3d 1396, 1398 (11th Cir.

1997).  The final decision  to discipline the Plaintiffs was subject to an administrative review process under the DeKalb County Merit System.   None of the Plaintiffs appealed their disciplinary actions.  Thus, DeKalb County is not liable for the decision to discipline the Plaintiffs.   Id.  All of the claims against DeKalb County may be dismissed on this basis alone, except for the claim that Douglas was improperly transferred.  There, Chief Graham had the final authority to transfer Douglas.  Based on my reading of the record, however, Douglas's transfer to another division prior to his termination, without a reduction in pay or benefits, was not an adverse employment action.  Akins v. Fulton County, 420 F.3d 1293, 1301 (11th Cir. 2005).

Plaintiff Smith's section 1981 racial discrimination claim should be dismissed. Smith argues that DeKalb County, Graham, and Flemister discriminated against him by suspending and demoting him.  In a discrimination action brought under section 1981, "a plaintiff must first establish a prima facie case of discrimination, which the defendants can rebut by offering a legitimate, non-discriminatory reason for the allegedly discriminatory act." Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004).  "If the defendant successfully rebuts the plaintiff's prima facie case, the presumption of discrimination is eliminated." Id. (citations and quotations omitted). To survive summary judgment, the plaintiff must point to evidence sufficient to permit

a reasonable factfinder to decide that the employer's reason was merely a cover for racial discrimination.  Id.

The Plaintiffs all but abandon this claim in their Response writing only two sentences about the allegation and stating that "the same analysis [referring to the First Amendment analysis] is applicable to Smith's race discrimination claim.  Not only is thee [sic] this same evidence of pretext, but there is an abundance of recorded racial statements made by Graham and Flemister."  (Pls.' Resp. to Defs.' Mot. for Summ. J., at 28-29.)  Furthermore, it should be noted that the Plaintiffs allegations are confusing and particularly difficult to follow as the Brief fails to consistently cite to record evidence when making factual claims.  See L.R. 56.1B(3) ("All documents and other record materials relied on by a party moving for or opposing a motion for summary judgment *shall* be clearly identified for the court.  Where appropriate, dates and specific page numbers *shall* be given.") (emphasis added).  Thus, its description of the facts undermines its capacity to persuade.     This claim should be dismissed. Even if Smith had met his burden of establishing a prima facie case of discrimination, the Defendants have met their burden of establishing one or more non-discriminatory reasons for the demotion.  Chapman v. AI Transportation, 229 F.3d 1012, 1024 (11th Cir. 2000).  That is, Smith was demoted for violating DeKalb County policies.  And the Plaintiffs have failed to present enough evidence to create a jury question as to

whether the Defendants' reasons are a pretext for racial discrimination.  Indeed, Smith does not contest the fact he secretly recorded an officer or that he lied on a police report.  Rather, he contends that he was treated more harshly than other black officers. Although the Plaintiffs laundry list a series of individuals that were supposedly disciplined less harshly, the Court is unpersuaded that those individuals were similarly situated.[3]  Even if there is evidence that the DeKalb County police department has a racially charged environment, there is no evidence that the specific decision to demote Smith was prompted by race.  Rather, there is ample evidence that the decision was driven by Smith's misconduct which was described above.

## IV.  Conclusion

For the reasons stated above, the Defendants' Motion for Summary Judgment [Doc. 51] is GRANTED.

SO ORDERED, this 7th day of December, 2007.

s/ Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

---

[3] Indeed, in this instance, it appears that the black officers, Faust and Douglas, were disciplined more harshly than Smith, who is white.